### In re CRAZY EDDIE SECURITIES LITIGATION.

**OPPENHEIMER–PALMIERI FUND, L.P., Entertainment Marketing, Incorporated, and Elias Zinn, Plaintiffs,**

v.

**PEAT MARWICK MAIN & CO., KMG Main Hurdman, Eddie Antar, Sam Antar, Mitchell Antar, Eddy Antar, Sam E. Antar, Solomon E. Antar, David V. Panoff, Isaac Kairey, Steve Pasquariello, William H. Saltzman, James H. Scott, Jr., Edmond Levy, and Carl G. Zimel, Defendants.**

Nos. 87 CV 33, 88 CV 3481.

United States District Court,
E.D. New York.

Jan. 20, 1993.

342

Sirota & Sirota (Howard B. Sirota, of counsel), Milberg, Weiss, Bershad, Specthrie & Lerach, Pomerantz, Levy, Haudek, Block & Grossman, Stull, Stull & Brody, Lowey, Dannenberg, Bemporad, Brachtl & Selinger, P.C., Kaufman, Malchman, Kaufman & Kirby, Law Offices of Harvey Greenfield, Christopher Lovell, P.C., Law Offices of Joseph H. Weiss, Abbey & Ellis, New York City, for class plaintiffs.

Milbank Tweed Hadley & McCloy (C. Stephen Howard, Suzanne Toes, of counsel), Los Angeles, Ca, New York City, for plaintiff Oppenheimer–Palmieri Fund Ltd.

Folkenflik & McGerity (Max Folkenflik, Margaret McGerity, of counsel), New York City, for plaintiffs Entertainment Marketing Inc. and Elias Zinn.

Cadwalader, Wickersham & Taft (Howard R. Hawkins, Jr., of counsel), New York City, for plaintiff Crazy Eddie, Inc.

Shearman & Sterling (Joseph McLaughlin, of counsel), New York City, for defendants Peat Marwick Main & Co. and KMG Main Hurdman.

Kaye, Scholer, Fierman, Hays & Handler (Steven Glassman, of counsel), New York City, for defendant Oppenheimer & Co., Inc.

Davis, Markel & Edwards (Thomas J. Sweeney, III, of counsel), New York City, for defendant Peat Marwick Main & Co.

Weil, Gotshal & Manges (Dennis J. Block, of counsel), New York City, for defendants Salomon Bros. Inc., Bear Stearns & Co., and Wertheim Schroder & Co., Inc.

Wilson Elser Moskowitz Edelman & Dicker (Richard Oelsner, of counsel), New York City, for defendants Penn and Horowitz, J. Liebman & Co., Gary Perlmutter and Mark Halperin.

Hoffman & Pollok, New York City, for defendants Jacob Tambor, Sasson Cohen and Zazy International Corp.

Rosenman & Colin, New York City, for defendants Leonard Rubin, Richard Portnoy and Wren Distributing Co.

Warner & Joselson (Jonathon D. Warner, Sheryl L. Bregman, of counsel), New York City, for defendant Sam E. Antar.

Beldock Levine & Hoffman (Brian E. Maas, of counsel), New York City, for defendant Isaac Kairey.

Leader & Berkon (Frederick D. Berkon, of counsel), New York City, for defendants Eddie Antar, Solomon E. Antar, Edmond Levy, William H. Saltzman, Steve Pasquariello, and Carl G. Zimel.

David M. Rubin, New York City, for defendant Abraham Grinberg.

Morgan, Lewis & Bockius (Kevin T. Rover, of counsel), New York City, for defendant David V. Panoff.

Kelley, Drye & Warren (John P. Marshall, of counsel), New York City, for defendant James H. Scott, Jr.

Eddie Antar, defendant pro se.

Eddie Gindi, defendant pro se.

Jean Cocchiara, defendant pro se.

Kathleen Morin, defendant pro se.

David Neiderbach, defendant pro se.

Arnold Spindler, defendant pro se.

Hellring Lindeman Goldstein & Siegal (Stephen L. Dreyfuss, Matthew E. Moloshok, of counsel), Newark, NJ, for defendants Danielle Antar, Deborah Rosen Antar, Gabrielle Antar, Simone Antar, Nicole Antar and Noelle Antar.

Law Offices of Raoul Lionel Felder, P.C., New York City, for defendant Deborah Rosen Antar.

Gersten, Savage, Kaplowitz & Curtin, New York City, for defendants Michelle Antar, Rose Antar, Rose M. Antar, Rori Antar, Sam A. Antar, Sam M. Antar, Allen Antar, Adam Kuszer, Benjamin Kuszer, Ellen Kuszer, Simon Kuszer and Lillian Rosen.

Kostelanetz Ritholz Tigue & Fink, New York City, for defendants Rose Antar and Sam M. Antar.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

This civil litigation arises from the allegedly fraudulent and negligent conduct of Eddie Antar and his relatives and the officers, directors, auditors, underwriters, employees, and vendors of the consumer electronics retailer Crazy Eddie, Inc. ("Crazy Eddie") (now in bankruptcy).

The various complaints in the case have alleged, in summary, that from 1980 through 1987, Eddie Antar, founder of Crazy Eddie, together with numerous relatives and associates, engaged in a series of spectacularly bold schemes designed falsely to portray Crazy Eddie as a thriving commercial enterprise so that investors would buy shares in it and those shares would sell at an inflated price. According to the proposed amendment to the class action complaint in *In re Crazy Eddie Sec. Litig.* (the "Class Complaint"), Eddie Antar realized cash proceeds of $72,245,649, his father Sam M. Antar realized $16,857,332, and other family members and associates realized lesser amounts. In this opinion the court refers to this series of schemes collectively as the "Crazy Eddie Fraud."

The court addresses three motions. The class plaintiffs move to amend their complaint. Their proposed complaint, styled as the "Fourth Supplemental Amended and Consolidated Complaint," newly alleges that defendants Peat Marwick Main & Co. and KMG Main Hurdman (now merged and referred to collectively as "Peat Marwick") violated sections 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, and makes additional changes to reflect previous rulings of this court.

Plaintiffs Entertainment Marketing, Inc. and Elias Zinn move to amend their complaint (the "EMI/Zinn Complaint"). The proposed complaint (i) adds a RICO claim against Peat Marwick and other individual defendants, (ii) broadens the previously asserted claim of common law fraud to encompass Peat Marwick and adds a demand for punitive damages, (iii) broadens the negligence claims to encompass certain individual defendants, (iv) eliminates one claim, and (v) drops certain defendants from other claims.

Peat Marwick cross-moves for summary judgment on the negligence and negligent misrepresentation claim alleged in the EMI/Zinn Complaint.

Numerous memoranda and orders of this court have recounted the facts of this litigation. The court assumes familiarity with its previous published memoranda and orders dated December 30, 1988, *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962 (E.D.N.Y.1988); June 16, 1989, *In re Crazy Eddie Sec. Litig.*, 714 F.Supp. 1285 (E.D.N.Y.1989); June 19, 1990, *In re Crazy Eddie Sec. Litig.*, 740 F.Supp. 149 (E.D.N.Y.1990); September 19, 1990, *In re Crazy Eddie Sec. Litig.*, 747 F.Supp. 850 (E.D.N.Y.1990); March 6, 1991, *In re Crazy Eddie Sec. Litig.*, 135 F.R.D. 39

(E.D.N.Y.1991); May 1, 1992, *In re Crazy Eddie Sec. Litig.*, 792 F.Supp. 197 (E.D.N.Y.1992) (the "May 1992 Order"); and September 4, 1992, *In re Crazy Eddie Sec. Litig.*, 802 F.Supp. 804 (E.D.N.Y.1992) (the "September 1992 Order").

I

*RICO Claims Against Peat Marwick*

The court considers together the motions of the class plaintiffs and the EMI/Zinn plaintiffs to add RICO claims against Peat Marwick.

A

The substance of these claims is that Alphonse Ferrara, the former Peat Marwick partner who supervised or substantially participated in that firm's audit of Crazy Eddie financial statements for the years ending 1985, 1986 and 1987, knew about or deliberately disregarded obvious evidence of material misrepresentations in Crazy Eddie financial statements and intentionally concealed fraud from its directors, underwriters, and investors.

1. *Allegations common to both complaints*

The two complaints allege, in substance, the following.

(a) *Failure to investigate discovered inventory fraud in 1985.* In the course of Ferrara's first annual audit in 1985, he learned that Crazy Eddie inventory tickets and count sheets at three separate stores were physically altered, inflating the company's inventory by more than $1 million. He spoke to Eddie Antar who explained that the alterations must have been made by a disgruntled employee and not by management. Ferrara accepted this explanation, adjusted the inventory to reverse the effect of the known alterations, and took no further steps to ascertain whether the fraud was wider than the known alterations.

Ferrara failed to broaden the scope of Peat Marwick's inventory audit in 1986, despite his discovery of attempted fraud the year before. As a result, according to the EMI/Zinn Complaint, Ferrara overlooked a scheme devised by Eddie Antar to overstate Company inventory by $12 to $14 million.

(b) *Active concealment of the Zazy scheme in 1986.* On March 5, 1987 Crazy Eddie's counsel, James Purcell of Paul Weiss Rifkind Wharton & Garrison, was informed by individuals at Salomon Brothers Inc that an anonymous telephone caller had told them of "theft at the highest levels of Crazy Eddie management" involving the three members of Crazy Eddie's "Office of the President" and Zazy International ("Zazy"). Plaintiffs would later learn of a variety of fraudulent transactions, including theft of Company inventory, perpetrated by Crazy Eddie and Zazy.

Purcell asked Ferrara and James H. Scott, Jr., a Columbia Business School professor who then headed the Crazy Eddie Audit Committee, thoroughly to investigate the Zazy transactions. Purcell memorialized these conversations in a contemporaneous "Office Memorandum" discovered shortly before the EMI/Zinn plaintiffs sought leave of the court to amend their complaint.

Peat Marwick had not yet started its 1987 audit and could easily have designed the audit to examine the Zazy transactions. It did not.

According to minutes of a meeting of the Crazy Eddie Audit Committee on June 8, 1987, appended to the EMI/Zinn Complaint, "representatives" of Peat Marwick, alleged to include Ferrara, reported that Peat Marwick had investigated allegations of "irregularities with respect to sales by the Company to Zazy's" and that it had "no reason to believe that any irregularities had occurred." Ferrara later said that he was never asked to investigate the Zazy transactions and, in fact, never conducted such investigation.

Ferrara refused to investigate the Zazy transactions because, he explained to Sam E. Antar, he was afraid such investigation might force him to resign from the Crazy Eddie account.

(c) *Assisting the debit memo fraud in 1987.* In approximately May of 1987, Peat Marwick, through Ferrara, surreptitiously changed Crazy Eddie's method of accounting for purchase discounts and trade allowances, apparently allowing the Company to reduce accounts payable from $70 million to $50 million for the year ending March 1, 1987.

The debit memo fraud allegedly worked in the following manner. Crazy Eddie, like other retailers, would periodically return goods to suppliers. After returning goods the supplier would provide Crazy Eddie with a debit memo, commonly called a "reep," entitling Crazy Eddie to reduce the amount it owed on its next payment to the supplier. In fiscal 1986 and before, Crazy Eddie reportedly did not "recognize" these purchase discounts and trade allowances for accounting purposes until they were deducted from checks written by Crazy Eddie to the supplier.

Beginning in fiscal 1987, Crazy Eddie recognized these purchase discounts and trade allowances when it received a debit memo from the supplier. This change in accounting principle allowed Crazy Eddie insiders to create $20 million in fictitious debit memos, thereby reducing (by causing debits to be posted to) accounts payable. Neither complaint states which account received an offsetting credit for $20 million.

The complaints allege that Ferrara knew that the amount of debit memos in 1987 vastly exceeded purchase discount and trade allowance debit memos in 1986, yet he failed to examine them. Moreover, Peat Marwick failed to indicate that the accounts payable in 1987 were not reported in a manner consistent with the reporting of accounts payable in 1986, in violation of generally accepted accounting principles.

The complaints suggest that any trained accountant would have discovered the debit memo fraud, given the size of the scheme and the inherent risk of fraud posed by the immediate recognition of debit memos, and that Ferrara willfully ignored unmistakable evidence of such fraud.

2. *Allegations contained in the Class Complaint*

The Class Complaint alleges, in substance, the following additional instances of misconduct.

(a) *Misrepresentations to underwriters.* Ferrara intentionally misled underwriters in the course of their due diligence inquiries in three or more instances.

First, he lied about a table that was included in prospectuses distributed in connection with two public offerings of securities in March and again in June of 1986. The table, which provided a breakdown of Crazy Eddie product sales by product category, had been created by Sam E. Antar based on his "seat-of-the-pants" guess. When Sam E. Antar was pressed by the underwriters to provide back-up documentation to support his numbers, which both he and Ferrara knew he could not provide, Ferrara provided a "comfort letter" to the underwriters. Ferrara allegedly issued this letter so that the underwriters would not discover that Sam E. Antar had fabricated some of the information in the prospectus.

Second, Ferrara falsely informed defendants Salomon Brothers Inc, Bear Stearns & Co., Inc., and Wertheim Schroder & Co., Inc. that the Crazy Eddie's Management Information System was functioning when he knew it was essentially non-functional.

Finally, he further misled various underwriters about the nature of Crazy Eddie's internal management and financial controls, and he failed to inform them of non-arms-length transactions between the Company and various Antar family members.

(b) *Reckless conduct.* In addition, Ferrara engaged in instances of reckless accounting practices too numerous to recount here. For example, even after Ferrara learned that Crazy Eddie employees had physically tampered with Peat Marwick's audit work papers, he failed to safeguard the work papers. This allowed Crazy Eddie employees to continually rework Peat Marwick's numbers during evenings after Peat Marwick auditors had gone home.

3. *Allegations contained in the EMI/ Zinn Complaint*

The EMI/Zinn Complaint alleges, in substance, the following additional acts of deliberate misconduct.

(a) *Destroying documents after November 6, 1987.* After new management took control of the Company on November 6, 1987 and discovered an apparent $45 million inventory short-fall, Ferrara, who was asked to assist in the ensuing investigation, destroyed documents to conceal fraudulent transactions with Zazy prior to the end of fiscal 1987.

(b) *Phony adjustments to inventory in 1986 and 1987.* While preparing the financial statement for fiscal 1986, Ferrara made fictitious adjustments, having no basis in fact, in order to reduce the year-end inventory total. Ferrara and possibly others at Peat Marwick made similarly fictitious adjustments during the following year. He allegedly made these adjustments in order to conceal the fraudulent overstatement of Company inventory.

(c) *Financial anomalies.* Much as the Class Complaint alleges numerous specific instances of reckless conduct, the EMI/ Zinn Complaint alleges numerous instances of implausible financial trends. For example, as a combined result of the debit memo and inventory frauds during fiscal 1987, the Company's reported inventory increased from $60 million to $109 million during 1987 whereas reported accounts payable declined from $52 million to $50 million. Such disparate trends, the complaint alleges, must have alerted Ferrara to fraud.

B

Peat Marwick opposes both motions to amend. It contends, first, that the motions should be denied because (a) both proposed complaints (i) fail to allege with particularity the predicate acts of mail fraud, wire fraud, or, in the case of the EMI/Zinn Complaint, "fraud in the sale of securities," and (ii) fail to state a violation under 18 U.S.C. § 1962; and, (b) the EMI/Zinn Complaint fails to allege causation with particularity.

Peat Marwick contends, second, that it would be unduly prejudiced in both instances if the court grants leave to amend.

1.

█ The court rejected the contention that Peat Marwick would be unfairly prejudiced by the addition of a RICO claim, stating in its May 1992 Order that:

> Peat Marwick had notice of the facts that give rise to this alleged RICO claim because it relates to the fraud and other claims set forth in the Second Complaint. The only new fact is that Ferrara, a Peat Marwick partner, "actually knew" of the fraud committed....
>
> Although Peat Marwick will have to investigate the new fact of knowledge, it will not be unduly prejudiced by the addition of the RICO claim.

*In re Crazy Eddie Sec. Litig.,* 792 F.Supp. at 205.

Peat Marwick contends, in its opposition to the motion to amend the EMI/Zinn Complaint, that it will be prejudiced because that complaint makes many allegations "on information and belief." Since discovery is now complete, it says it either will have to go to trial on an amended pleading without adequate discovery on the new factual allegations, or will be "forced to endure yet further delay necessitated by the taking of additional discovery."

The EMI/Zinn plaintiffs have submitted, in reply, documents and deposition testimony already available to Peat Marwick which appear to support most of the allegations of fact and many of the inferences made upon information and belief.

If after reviewing the reply submission, Peat Marwick wishes to apply to Magistrate Judge Carter for additional discovery, it is free to do so.

2.

Peat Marwick contends that the motions to amend the complaints to add RICO claims are futile because neither proposed complaint could withstand a motion to dismiss under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. The

court tests both complaints by the standard imposed by these rules.

To state a claim under the RICO Act, plaintiffs must meet two pleading burdens. First, they must allege that each defendant violated section 1962. Plaintiffs must allege seven constituent elements: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce. 18 U.S.C. § 1962(a)–(c) (1976)." *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir.1983) *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Or plaintiffs must allege that the defendant conspired to engage in such a pattern of racketeering activity. 18 U.S.C. § 1962(d).

"Racketeering activity" is defined to include, among other crimes, (i) any act which is indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), and (ii) "any offense involving ... fraud in the sale of securities ... punishable under any law of the United States."

Second, plaintiffs must allege they were injured in their business or property "by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

### a.
### *Whether Peat Marwick violated section 1962*

#### (1) *"Racketeering activity"*

The Class Complaint alleges that Peat Marwick violated the mail and wire fraud statutes. The EMI/Zinn Complaint alleges that Peat Marwick engaged in mail fraud and "fraud in the sale of securities."

■ Peat Marwick contends that the proposed complaints fail to state the required elements of any of these offenses with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. That rule imposes a heightened pleading burden whenever fraud is alleged in order to provide defendants with fair notice of the claims, to protect them from harm to reputation or goodwill due to unfounded allegations, and to reduce the number of strike suits. *See Bernstein v. Crazy Eddie, Inc.,* 702 F.Supp. at 976. A complaint should specify the time, place, speaker, and content of alleged misrepresentations. *Luce v. Edelstein,* 802 F.2d 49, 54 (2d Cir.1986).

#### (A) *Mail and wire fraud*

■ To state a claim for mail fraud, under 18 U.S.C. § 1341, or for wire fraud, under 18 U.S.C. § 1343, the complaint must allege (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in the scheme, and (3) the use of interstate mails or wire communications in furtherance of the scheme. *See Griffin v. McNiff,* 744 F.Supp. 1237, 1255 (S.D.N.Y.1990) (mail fraud).

#### (1) *Existence of a scheme*

■ Beyond any question, the two complaints allege the existence of a scheme to defraud with sufficient particularity. The EMI/Zinn Complaint is replete with specific allegations of fraudulent schemes in 1985 to 1987 materially to overstate inventory and understate accounts payable, to engage in sham transactions, and to conceal such fraudulent misrepresentations contained in Crazy Eddie's annual, quarterly and periodic financial disclosures. The Class Complaint is even more richly ornamented with details of the alleged Crazy Eddie Fraud, beginning in 1980.

The court need not dwell on these details, as Peat Marwick does not deny in its responsive papers the existence of a scheme among at least some of the defendants to defraud investors.

#### (2) *Participation in the scheme with intent*

Again beyond question, the complaint alleges that Peat Marwick participated in the Crazy Eddie Fraud in numerous ways by certifying the various fraudulent financial statements and by representing to the Crazy Eddie directors and the investment community that such statements fairly stated the financial condition of the Company.

The more difficult question is whether the complaints allege with particularity that Peat Marwick participated with intent to defraud.

■ To show intent to defraud, plaintiffs must allege that Peat Marwick acted knowingly to deceive contemplating causing financial loss to another. *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987). "[S]uch knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." *United States v. Cano*, 702 F.2d 370, 371 (2d Cir.1983) (per curiam).

Plaintiffs assume, and Peat Marwick does not contest, that intentional participation by its partner, Ferrara, constitutes intentional participation by Peat Marwick. Thus, plaintiffs may show that Peat Marwick participated with intent to defraud by showing that Ferrara acted with deliberate disregard of the Crazy Eddie Fraud, or that he acted with a conscious purpose to avoid learning the truth.

■ Rule 9(b) imposes additional specific pleading requirements to show intent. Although the rule provides that "intent ... and other condition of mind ... may be averred generally," plaintiffs must plead factual allegations giving rise to a "strong inference" that defendants possessed the requisite fraudulent intent. *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

A complaint can meet this burden in two ways. Either it can allege facts showing that a defendant had a clear motive and opportunity for participating in the fraud. *Id.* Or it can identify "circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Id.* (citations omitted).

The EMI/Zinn Complaint makes some allegations going to opportunity and motive. Ferrara had the opportunity to misstate financial statements and conceal fraud. The complaint suggests he was driven to retain his lucrative relationship with Crazy Eddie. Indeed, he had allegedly negotiated

a pay raise from Peat Marwick in the spring of 1984 after accepting a generous offer by Crazy Eddie to serve as Chief Financial Officer. Later Ferrara allegedly negotiated a $1 million a year consulting agreement on behalf of Peat Marwick with Crazy Eddie.

■ But a jury could also infer, to the contrary, that Ferrara would be highly motivated to pursue evidence of widespread fraud, given that his conscious avoidance would be likely to result eventually in substantial financial and reputational costs to him and his firm. Thus, if this complaint's allegation of intent to deceive rested solely on Ferrara's opportunity and motive, it would fail. *See, e.g., Securities & Exch. Comm'n v. Price Waterhouse*, 797 F.Supp. 1217, 1242 (S.D.N.Y.1992) (finding that lucrative fees alone do not suggest an adequate motive to commit fraud).

■ The two complaints also allege a pattern of conduct by Ferrara that strongly suggests, at a minimum, that he willfully avoided discovering, and deliberately disregarded evidence of, the Crazy Eddie Fraud.

His alleged refusal in 1987 to investigate the Zazy transactions after being told to do so by both outside counsel and the chairman of the Crazy Eddie Audit Committee, together with his statement to Sam E. Antar that he was afraid of what he might find, suggests, at best, that he willfully ignored evidence of fraud or, at worst, that he deliberately misled the Audit Committee in order to conceal the fraud.

The pleaded facts surrounding the change in accounting procedure in 1987 for recognizing debit memos, given the scale of the fraud and Peat Marwick's failure to note that the 1987 financial statement was not stated in a manner consistent with prior years, can support an inference by a jury of willful fraudulent conduct.

The Class Complaint alleges that Ferrara deliberately misled underwriters so that they would not learn that Sam E. Antar had fabricated a table of product sales by product category contained in prospectuses for two public offerings of securities in 1986. And the EMI/Zinn complaint alleges

that Ferrara destroyed documents after November 6, 1987 in order to conceal the Zazy fraud. Both of these allegations suggest that Ferrara willfully sought to conceal fraud.

The court finds, after considering each proposed complaint separately, that both allege specific facts that would permit an inference that Peat Marwick, through its partner Ferrara, participated in the Crazy Eddie Fraud with conduct "calculated to deceive."

### (3) *Use of the mails and wires*

■ The Class Complaint alleges with precision the fraudulent financial statements mailed or communicated by wire by Crazy Eddie in the ordinary course of business, with the knowledge and consent of Peat Marwick. Specifically it states that on May 2, 1985, Peat Marwick issued a financial statement for a two year period ending May 31, 1984 and a nine month period ending March 3, 1985. This report was reproduced with Peat Marwick's knowledge and consent in a March 1986 prospectus used in connection with the public offering of Crazy Eddie securities. Peat Marwick issued a report dated May 1, 1986 regarding Crazy Eddie's financial status as of March 2, 1986 and March 3, 1985. This report was reproduced with Peat Marwick's knowledge and consent in a June 1986 prospectus. On June 15, 1987, Crazy Eddie filed with the Securities and Exchange Commission (the "SEC") its Form 10–K for the year ended March 1, 1987.

The EMI/Zinn Complaint alleges somewhat less precisely that in furtherance of the Crazy Eddie Fraud, Crazy Eddie used the United States postal service in 1986 and 1987 to mail copies of (i) Form 10–Q and Form 10–K to the SEC, (ii) annual reports on Form 10–K to Company shareholders, (iii) Form S–1 to all investors in various public offerings, and (iv) earnings releases and other press releases to a variety of news organizations and securities analysts.

Peat Marwick has argued that the complaints are deficient because they fail, first, to allege specific mailing dates, receipt dates, and other details, and, second, to explain how Peat Marwick "caused" such mailings or wire communications.

Peat Marwick seemingly concedes that annual filings and prospectuses of publicly-traded companies are broadly distributed through the United States mail and, even at the time of this fraud, through interstate computer and electronic wire communication. There is no point in requiring plaintiffs to plead in greater detail the particulars of such mailing and wire communications. Peat Marwick has been informed of what was sent, by whom, to whom, the approximate dates, and how such statements are said to be false. Peat Marwick needs no more in order to frame a defense; the court needs no more to find that the claims appear to have merit.

Cases cited by Peat Marwick provide no basis for a different conclusion. In *Browning Ave. Realty Corp. v. Rosenshein*, 774 F.Supp. 129, 137–38 (S.D.N.Y. 1991), for example, the court found that the complaint failed to allege the time, place, speaker, and content of allegedly fraudulent misrepresentations; it failed to allege facts sufficient to support an inference of fraudulent intent; and it failed to particularize each defendant's alleged participation in the fraud. The complaints here are adequate in each of these respects.

*Duke v. Touche Ross & Co.*, 765 F.Supp. 69 (S.D.N.Y.1991), presents a closer case. There, an accounting firm prepared two materially misleading documents included in private placement memoranda used in connection with the sale of limited partnership interests. Although the court found that the complaint adequately alleged the accounting firm intended to deceive investors, it found that predicate acts of mail fraud had not been alleged with particularity. But there, the complaint failed to allege that the private placement memoranda including defendant's two false documents had been placed into the mail or sent by mail; it merely alleged in a general manner that the accounting firm and promoters had used the mails and wire communication. The complaints here, in contrast, precisely allege the sending of specific docu-

ments containing opinions and financial statements prepared by Peat Marwick.

There is no merit to Peat Marwick's second contention that it did not "cause" these mailing. Peat Marwick relies on *McLaughlin v. Anderson*, 962 F.2d 187, 191 (2d Cir.1992), a civil RICO case which states that "[w]hile there is no requirement that the defendant personally mail a letter, the plaintiff must show '1) that the defendant "caused" the mailing ... and 2) that the mailing was for the purpose of executing the scheme or ... "incidental to an essential part of the scheme."' *United States v. Bortnovsky*, 879 F.2d 30, 36 (2d Cir.1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–63, 98 L.Ed. 435 (1954))."

The statutory term "causes" in 18 U.S.C. § 1341 was explained in *Pereira*, a criminal mail fraud case. There, defendant induced a woman through a "confidence game" to provide him $35,000 for the ostensible purpose of investing in a hotel. She arranged with her bank in California to sell some securities and mail the proceeds to a bank in Texas. The Court held that the defendant "caused" this mailing, reasoning that "[w]here one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen even though not actually intended, then he 'causes' mail to be used." *Id.* at 8–9, 74 S.Ct. at 363.

Plainly the word "causes" in the statute cannot have one meaning in a criminal prosecution and another in a civil proceeding seeking damages for violation of the same criminal statute. Thus, the *McLaughlin* case does not support Peat Marwick's contention that to "cause" mail fraud, a civil RICO defendant must be more closely tied to the fraudulent mailing than a criminal mail fraud defendant. The *McLaughlin* court merely found that vague and conclusory allegations—that, for example, one party was believed to be "behind" a specific mailing—to be insufficiently particular.

Peat Marwick also cites *Morin v. Trupin*, 778 F.Supp. 711, 719 (S.D.N.Y.1991), for the proposition that letters sent in furtherance of a fraudulent scheme could not be imputed to an in-house attorney (or, here, an outside accountant) who is not a "controlling person." But in *Morin*, the in-house counsel was not responsible in even a minor fashion for the letter allegedly comprising an indictable act of mail fraud.

The proposed complaints here allege facts showing that Peat Marwick "caused" such communications by preparing and opining on financial statements, knowing (or reasonably foreseeing) that such opinions and statements would be transmitted by United States mail and interstate wire communication in the ordinary course of business in furtherance of a scheme to inflate the market value of Crazy Eddie securities. Unlike certain *McLaughlin* defendants and the in-house attorney in *Morin*, Peat Marwick had a certain and direct connection to the materials sent by interstate mail and wire.

#### (4) *Reliance not an element of mail or wire fraud*

Last, Peat Marwick contends that the Class Complaint fails to allege reliance with particularity and that the EMI/Zinn Complaint fails to allege that plaintiffs received a single fraudulent financial statement by mail or wire communication.

These contentions are misplaced. Plaintiffs need not even allege they received, let alone relied on fraudulent financial statements, in order properly to plead predicate acts of mail and wire fraud. These statutes punish even unexecuted schemes. *See Durland v. United States*, 161 U.S. 306, 313–15, 16 S.Ct. 508, 511–12, 40 L.Ed. 709 (1896); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987).

The court addresses below (at pages 355–356) whether plaintiffs adequately allege injury under section 1964(c) "by reason" of a violation of section 1962.

In conclusion, the court finds that both complaints allege mail fraud, and the Class Complaint alleges wire fraud, with sufficient particularity.

(B) *"Fraud in the sale of securities"*

(1) *The EMI/Zinn Complaint*

The EMI/Zinn Complaint also alleges that Peat Marwick engaged in "fraud in the sale of securities."

The court stated, in its May 1992 Order, that a "RICO claim against Peat Marwick would be insufficient if based on predicate acts of 'fraud in the sale of securities,' because Peat Marwick did not engage in the sale of securities." *In re Crazy Eddie Sec. Litig.*, 792 F.Supp. 197, 204 (E.D.N.Y. 1992), citing *In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F.Supp. 668, 684 (S.D.N.Y.1990).

The EMI/Zinn plaintiffs urge the court to reexamine this question, drawing attention to Justice O'Connor's conclusion in a concurring opinion in *Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, —— – ——, 112 S.Ct. 1311, 1322–27, 117 L.Ed.2d 532 (1992) (decided March 24, 1992), that a RICO defendant may commit "fraud in the sale of securities" without engaging in the sale of securities. Justice White and Justice Stevens joined Justice O'Connor's concurrence; Justice Scalia endorsed her view in a separate concurrence; and the remaining five Justices did not reach the question.

(i) *Willful violation of section 10(b) as RICO predicate act*

Section 1961(1)(D) defines racketeering activities to include, among other indictable offenses, "any offense involving ... fraud in the sale of securities ... punishable under any law of the United States." The Act does not further define "fraud in the sale of securities," nor does section 1961(1)(D), unlike most other subsections of section 1961(1), cross-reference to any specific sections of the United States Code. Moreover, the legislative history provides no guidance. *See Holmes*, at ——, 112 S.Ct. at 1325 (O'Connor, J., concurring).

Justice O'Connor noted that lower federal courts have not reached an agreement over "which violations of the federal securities laws, if any, constitute a 'fraud in the sale of securities' within the meaning of § 1961(1)." *Id. Compare In re Par Pharmaceutical, Inc. Sec. Litig.*, 733 F.Supp. 668 (S.D.N.Y.1990) (holding that violation of Rule 10b–5 can only be a predicate offense if fraud occurs in the actual sale of securities) *with In re Catanella and E.F. Hutton & Co. Sec. Litig.*, 583 F.Supp. 1388, 1425 n. 56 (E.D.Pa.1984) (holding that violation of Rule 10b–5 in connection with purchases and sales can be a predicate offense) and *Lou v. Belzberg*, 728 F.Supp. 1010, 1026 (S.D.N.Y.1990) (holding that violation of Hart–Scott–Rodino reporting requirements relates to "fraud in the sale of securities" and may constitute a RICO predicate offense).

She observed that the RICO statute "unmistakably requires that there be fraud, sufficiently willful to constitute a criminal violation, and that there be a sale of securities." 112 S.Ct. at 1325. And she noted that "[t]o the extent that RICO's reference to an 'offense involving fraud in the sale of securities' encompasses conduct that violates § 10(b), ... the relevant predicate is defined not by § 10(b) itself, but rather by § 32(a)" of the Securities Exchange Act of 1934 (the "1934 Act"). 15 U.S.C. §§ 78a *et seq.*

Section 32(a), in pertinent part, authorizes criminal penalties against "[a]ny person who willfully violates any provision of this chapter (other than section 78dd–1 of this title)," 15 U.S.C. § 78ff(a), referring to all provisions of the 1934 Act (other than one regarding foreign corrupt practices by issuers).

■ Following Justice O'Connor's concurrence, this court concludes that any violation of section 10(b) sufficiently willful to trigger the criminal penalties of section 32(a) constitutes "fraud in the sale of securities."

The EMI/Zinn Complaint alleges that Peat Marwick violated section 10(b). To state such a claim a complaint "must allege with particularity (1) a misstatement or omission by the defendant; (2) as to a material fact; (3) upon which plaintiff relied; (4) and which caused damages. In addition, the plaintiff must show that (5) defendant acted with scienter; and that (6) the misstatement or omission was made in

connection with the purchase or sale of securities." *Morin v. Trupin,* 778 F.Supp. 711, 717 (S.D.N.Y.1991).

Courts within the Second Circuit have developed specific tests for determining whether accountants intended to deceive. *See, e.g., Securities Exchange Comm'n v. Price Waterhouse,* 797 F.Supp. 1217 (S.D.N.Y.1992) (under section 10(b) plaintiff "must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or 'an egregious refusal to see the obvious, or to investigate the doubtful,' or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts" (citations omitted)).

■ The court holds, and Peat Marwick does not contend otherwise, that the EMI/Zinn Complaint adequately alleges each of these elements. The EMI/Zinn Complaint alleges that plaintiffs lost $15.7 million due to their reasonable reliance on materially misleading financial statements prepared by and distributed to the public with the consent of Peat Marwick. It also alleges specific facts permitting an inference, as the court stated above, that Peat Marwick intended to deceive.

The EMI/Zinn Complaint also alleges facts upon which a jury could reasonably infer that Peat Marwick "willfully" violated section 10(b), giving rise to criminal penalties under section 32(a). A defendant acted "willfully," within the meaning of section 32(a), if he "acted deliberately and intentionally and his acts, statements or omissions were not the result of innocent mistake, negligence or inadvertence or other innocent conduct." *United States v. Dixon,* 536 F.2d 1388, 1396 (2d Cir.1976).

The Second Circuit has recently observed that, with respect to a RICO predicate act based upon a violation of section 12(2) of the Securities Act of 1933 (the "1933 Act"):

> willfulness may be established by a showing (1) that the defendant either (a) knowingly made false or materially incomplete misleading statements or (b) made false or materially incomplete misleading statements with respect to facts

to which he had deliberately closed his eyes but which he had a duty to see, and (2) that he knew that his statements significantly increased the possibility of a sale of securities in question.

*Metromedia Co. v. Fugazy,* 983 F.2d 350, 364 (2d Cir.1992) (applying a definition of willfulness under section 32(a) of the 1934 Act to a violation of the 1933 Act).

Having already concluded that the EMI/Zinn Complaint alleges with particularity that Peat Marwick drew up and certified false and misleading financial disclosures in deliberate disregard of the Crazy Eddie Fraud, the court holds that the EMI/Zinn Complaint adequately alleges willful conduct. *See also United States v. Simon,* 425 F.2d 796 (2d Cir.), *cert. denied,* 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970) (affirming criminal conviction of accountants, under section 32(a) and other statutes, who knowingly drew up and certified false and misleading corporate financial statements where jury could find that accountants knew of looting by the corporate President).

The court concludes that the EMI/Zinn Complaint alleges "fraud in the sale of securities" with particularity.

### (ii) *Actual sale requirement*

■ At least one court has held that "fraud in the sale of securities" imposes RICO liability only on the parties to the actual sale of securities. *See In re Par Pharmaceutical, Inc. Sec. Litig.,* 733 F.Supp. 668, 684 (S.D.N.Y.1990) (holding that "the phrase 'fraud in the sale of securities' as used by Congress in § 1961(1)(D) must be read to mean what it says, such fraud that occurs as a part of the actual securities transaction is a predicate act under the provision").

In her concurrence in *Holmes,* Justice O'Connor cast substantial doubt on the proposition that Congress intended to reach a narrower scope of fraud by referring to "fraud in the sale of securities" than an earlier Congress intended to reach, under section 10(b) of the 1934 Act, by referring to fraud "in connection with sale or pur-

chase of any security." —— U.S. at ——, 112 S.Ct. at 1326.

But even if the *Par Pharmaceutical* court correctly narrows the reach of "fraud in the sale of securities," the EMI/Zinn Complaint alleges facts with sufficient particularity that Peat Marwick aided and abetted, and conspired with at least Sam E. Antar, in the actual sale of securities.

■ Aiding and abetting liability requires (1) a securities law violation by a primary wrongdoer, (2) knowledge of the wrongdoing, and (3) substantial assistance in the primary wrongdoing. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Conspiracy requires (1) knowing participation or membership in a scheme to defraud, and (2) some knowledge of the unlawful aims and objectives of the scheme. *United States v. Lanza*, 790 F.2d 1015, 1022 (2d Cir.1986); defendant need not know of the full scope of such scheme to defraud. *Id.*

The EMI/Zinn Complaint alleges that Ferrara assisted with the preparation of Form S–1 Registration Statements used in March and June of 1986, knowing such statements to be materially false and knowing Crazy Eddie, Eddie Antar, and possibly other individual defendants would realize inflated proceeds. He not only participated but provided "substantial assistance" in the production of such fraudulent Registration Statements. That Ferrara had no idea of the vast scale of the underlying fraud provides Peat Marwick with no defense to a conspiracy claim.

By aiding and abetting and by conspiring, Peat Marwick violated sections 1962(c) and 1962(d), respectively, of the RICO Act. Thus, these acts constitute part of an alleged pattern of racketeering activity.

### (2) *The Class Complaint*

The Class Complaint does not list Peat Marwick in paragraph 206 among the defendants alleged to have engaged in "fraud in the sale of securities," presumably because the class plaintiffs sought to conform their complaint to the previous language of this court. Nevertheless, the Class Complaint, like the EMI/Zinn Com-

plaint, alleges facts with particularity suggesting that Peat Marwick committed predicate acts of "fraud in the sale of securities."

Because, in light of the *Holmes* concurring opinions and of the Second Circuit's extremely expansive reading of the RICO statute in civil cases, the court now adopts a less restrictive reading of "fraud in the sale of securities" than it stated in its May 1992 Order, class plaintiffs may amend paragraph 206 of their complaint to allege that Peat Marwick, too, engaged in "fraud in the sale of securities."

Peat Marwick will not be prejudiced by such amendment of the Class Complaint since it had an opportunity to brief this question in its opposition to the EMI/Zinn motion to amend, and since it will have an opportunity to move for summary judgment with respect to alleged securities fraud.

### (2) *Whether the proposed complaints satisfy the other requirements of section 1962*

Peat Marwick also contends that the two complaints fail to allege certain other elements required to show a violation of section 1962.

### (a) *"Pattern" of racketeering activity*

■ This court has already observed, with respect to the individual RICO defendants in the Class Complaint, that:

The acts allegedly constituted part of an ongoing scheme to defraud shareholders by fostering the false impression that Crazy Eddie was a rapidly growing company. The scheme was allegedly carried out over a period of years and presumably would have continued, albeit not indefinitely, if new management had not ousted the individual defendants. The racketeering acts were "neither isolated nor sporadic," and therefore constitute a "pattern of racketeering activity."

*In re Crazy Eddie Sec. Litig.*, 714 F.Supp. at 1289 *citing Beauford v. Helmsley*, 865 F.2d 1386 (2d Cir.1989) (*en banc*), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). The alleged acts by Peat Marwick, beginning in 1985 and con-

tinuing until the Crazy Eddie Fraud was discovered in late 1987, are similarly related and continuous.

Peat Marwick nevertheless contends that both complaints fail to allege a "pattern" because the alleged predicate acts do not have the requisite continuity and relatedness required by *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). Specifically it argues in a footnote that each Peat Marwick annual audit was a "self-contained unit" which could not form the basis of a continuous pattern.

This argument has no merit. It suggests that an accounting firm can publicly vouch for the accuracy of financial disclosures year after year, knowing them to be profoundly false and intending that investors be misled, then claim immunity from RICO liability merely because the firm's underlying auditing contract was subject to annual renewal. Peat Marwick cites no authority for the proposition that Congress intended to immunize such culpable conduct for such purely formal reasons.

### (b) The "enterprise"

■ The Class Complaint alleges one "enterprise" composed of the Antar family members and another "enterprise" composed of persons related to Crazy Eddie. The complaint alleges facts to make plain that Peat Marwick participated, within the meaning of 1962(c), and conspired to participate, within the meaning of section 1962(d), in the alleged Crazy Eddie "enterprise."

The EMI/Zinn Complaint alleges, and Peat Marwick does not dispute, that Crazy Eddie was an "enterprise" and that the individual defendants acted as an association in fact. Both entities constitute "enterprises" within the meaning of 18 U.S.C. § 1961(4).

### (c) To "acquire" an interest in, "participate" in, or "conspire" with an enterprise

Both complaints allege violations of section 1962(c) and 1962(d). The EMI/Zinn Complaint also alleges a violation of section 1962(b).

Section 1962(b) provides that:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The EMI/Zinn Complaint "nowhere suggests that defendants' profits from their supposed pattern of racketeering activity were used to acquire control of Crazy Eddie" or any other enterprise. *Bernstein v. Crazy Eddie, Inc.*, 702 F.Supp. 962, 981 (E.D.N.Y.1988) (regarding a section 1962(b) violation previously alleged in the Class Action). The EMI/Zinn Complaint fails to allege a violation of section 1962(b).

■ Both complaints, on the other hand, allege violations of section 1962(c). Section 1962(c) provides that, "[i]t shall be unlawful for any person ... associated with any enterprise engaged in ... interstate or foreign commerce, to ... participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity." As already observed, the complaints adequately allege that Peat Marwick participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.

■ Both complaints also allege violations of section 1962(d). That subsection states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." To state a conspiracy claim, "plaintiff must allege that each defendant, by words or actions, manifested an agreement to commit two predicate acts in furtherance of the common purpose of the RICO enterprise." *First City Nat'l Bank and Trust v. Fed. Deposit Ins. Co.*, 730 F.Supp. 501, 509 (E.D.N.Y.1990).

The complaints allege facts from which a jury could infer that Peat Marwick, through Ferrara, "by words or actions, manifested an agreement" with Sam E. Antar and others falsely to certify the ac-

curacy of Crazy Eddie's annual financial statements and Form 10–K reports in 1986 and 1987, and to assist in the preparation of false Form S–1 Registration Statements in March and June of 1986.

### b.
### *Whether plaintiffs were injured "by reason of a violation of section 1962"*

■ Section 1964(c) provides, in pertinent part, that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter ... may sue ... in any appropriate United States district court." Plaintiffs must be able to show that their injuries were caused "by a pattern of racketeering activity violating section 1962 or by individual predicate acts." *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir.1990). Moreover, the RICO pattern or predicate acts must be the proximate cause of plaintiffs' injuries. *Holmes*, —— U.S. at ——– ——, 112 S.Ct. at 1316–18.

The Second Circuit has imposed varying requirements for demonstrating causation, depending on which violation of section 1962 or which predicate act caused injury.

#### (1) *Injury by reason of conspiracy*

■ Insofar as plaintiff alleges injury due to defendant's violation of section 1962(d) for criminal conspiracy, plaintiff must demonstrate injury attributable to at least one overt predicate act. *Hecht*, 897 F.2d at 23. To have standing to bring a claim for a violation of section 1962(d), the EMI/Zinn and class plaintiffs must show injury caused by at least one overt act of mail fraud, wire fraud, or "fraud in the sale of securities."

#### (2) *Injury by reason of mail or wire fraud*

■ Insofar as the injury is attributed to predicate acts of mail or wire fraud, plaintiff must show that the defendant's misrepresentations were relied upon. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 368 (2d Cir.1992) (mail and wire fraud); *County of Suffolk v. Long Island Light-*

*ing Co.*, 907 F.2d 1295, 1311 (2d Cir.1990) (mail fraud).

■ The EMI/Zinn Complaint alleges that plaintiffs purchased Crazy Eddie shares in reasonable reliance upon false financial disclosures sent by mail or transmitted by wire. Peat Marwick contends that plaintiffs must show that the very documents upon which they relied were mailed or sent by wire communications. Assuming this is so, the court holds that such detailed finding of fact must be made by a jury and need not be alleged in the complaint.

The EMI/Zinn Complaint adequately alleges that plaintiffs were injured by reason of predicate acts of mail fraud. Having shown injury by mail fraud, these plaintiffs need not also show injury by reason of "fraud in the sale of securities."

■ The class plaintiffs stand on a different footing. This court found, in its September 1992 Order, that not one of them could show that he or she relied on Crazy Eddie financial statements in purchasing Crazy Eddie securities. 802 F.Supp. at 812–13. The class plaintiffs therefore cannot show injury by reason of mail or wire fraud. They therefore must show injury by reason of "fraud in the sale of securities."

#### (3) *Injury by reason of "fraud in the sale of securities"*

This court knows of no decision by the Second Circuit, or any other court, addressing whether plaintiff must show that defendant's willful material misrepresentations or omissions were actually or presumptively relied upon in order to show injury by reason of "fraud in the sale of securities."

In *Basic v. Levinson*, 485 U.S. 224, 243–47, 108 S.Ct. 978, 989–92, 99 L.Ed.2d 194 (1988), an action arising under section 10(b) of the 1934 Act, the Supreme Court permitted plaintiff investors to rely on the ability of efficient securities markets to absorb and reflect publicly available information in the price of each share, even though plaintiffs could not show they directly relied,

when trading securities, on defendant company's materially misleading financial disclosures.

This "fraud on the market" theory, which both assumes and protects efficient securities markets, may well provide an appropriate theory of causation under 18 U.S.C. § 1964(c) where, as here, "fraud in the sale of securities" is alleged. Plainly, class plaintiffs in this action, who now hold worthless common stock or nearly worthless debentures, were harmed by reason of Peat Marwick's allegedly sustained efforts to conceal financial fraud and to manipulate upward the price of Crazy Eddie stock over a period of years by generating glowing but false financial disclosures.

But the court does not decide this question today. First, the papers before this court do not address the applicability of a "fraud on the market" theory to section 1964(c). Second, the parties could not readily foresee that the court would allow class plaintiffs to allege Peat Marwick engaged in "fraud in the sale of securities." Finally, the court is not aware of any case relying on or even considering a "fraud on the market" theory in the context of section 1964(c).

Accordingly, the court directs class plaintiffs to submit a brief within 20 days of the date of this order addressing whether their RICO claim against all defendants should be dismissed because class plaintiffs lack standing, under section 1964(c), since not one of them relied upon allegedly false financial disclosures when purchasing Crazy Eddie securities. Peat Marwick and other defendants, if they so chose, shall have 10 days thereafter in which to respond.

## II

### Other Submissions Relating to the EMI/Zinn Complaint

#### A

##### RICO Claim against Sam M. Antar

Sam M. Antar opposes the EMI/Zinn plaintiffs' motion to amend, contending, at least with respect to him, that the proposed complaint fails to plead fraud, scienter, or aider and abettor liability with particulari-

ty, and that he would suffer "tremendous prejudice" if the proposed complaint is allowed to stand.

At oral argument, plaintiffs sought, and the court gave, permission to submit supplemental allegations regarding Sam M. Antar.

1.

The supplemented EMI/Zinn Complaint alleges, in substance, the following.

Beginning in January or February 1986 and continuing until March 17, 1987, Sam M. Antar sat down with his son, Eddie Antar, and nephew, Sam E. Antar (the Company's Chief Financial Officer), and planned five specific fraudulent schemes: the fraudulent inflation of Company warehouse inventory by $3 million, the fraudulent inflation of Company store inventory by $1–2 million, a $2 million "reep" debit memo fraud, the "Wren fraud," and the overstatement of same store sales. The complaint further alleges that Sam E. Antar, who has already pleaded guilty in criminal proceedings arising from the Crazy Eddie frauds, has testified under oath regarding Sam M. Antar's participation in these frauds.

These five fraudulent schemes were intended to and did cause at least 15 financial disclosures, enumerated in the proposed complaint, each allegedly sent in the United States mail, to falsely portray Crazy Eddie as a thriving commercial enterprise.

The EMI/Zinn Complaint does not allege that Sam M. Antar sold Crazy Eddie securities.

2.

Whether or not the EMI/Zinn plaintiffs could plead facts sufficient to support RICO and fraud claims against Sam M. Antar, they have not done so here.

The court cannot determine, without going beyond the four corners of the supplemented complaint, the nature of the five fraudulent schemes allegedly planned by or with Sam M. Antar. The court declines to take judicial notice of facts pleaded in the Class Complaint because, even if such notice were appropriate, the court cannot eas-

ily match each of the five schemes tersely described in the supplemented EMI/Zinn Complaint with the schemes described in the Class Complaint.

The court denies, without prejudice, the motion to amend the EMI/Zinn Complaint with respect to Sam M. Antar.

### 3.

 The court will allow the EMI/Zinn plaintiffs to apply for leave to file a properly pleaded RICO claim against Sam M. Antar, notwithstanding his assertion that he would suffer "tremendous prejudice" because he is named in a conspiracy claim for the first time.

His contention that he could not have anticipated and did not explore in discovery an allegation of conspiracy is implausible. Since this and related litigation against former Crazy Eddie directors and officers began in 1987, each of the Crazy Eddie insiders, including Sam M. Antar, should have anticipated that plaintiffs would allege they conspired, within the meaning of section 1962(d), and participated, within the meaning of section 1962(c), in a racketeering enterprise.

The EMI/Zinn plaintiffs shall have twenty days from the date of this order to apply for leave so to amend.

### B
### *Claims against other individual defendants*

The EMI/Zinn Complaint alleges that Eddy Antar, Solomon E. Antar, Steven Pasquariello, Edmond Levy, William H. Saltzman, and Carl G. Zimel, together with other individual defendants, all violated section 10(b) of the 1934 Act. It further alleges a RICO and fraud claim against Eddy Antar and a negligence and negligent misrepresentation claim against the five defendants named above. These six defendants have stipulated that they "rely on opposition of defendant Peat Marwick" and that they preserve the right to move to dismiss at a later time.

In the absence of a motion and briefing, the court makes no decision with respect to claims against these six. The court notes, however, that the EMI/Zinn Complaint alleges fewer specific facts regarding all other individual defendants than it alleges regarding Sam M. Antar.

Plaintiffs may apply within twenty days from the date of this order for leave to amend the complaint with supplemental allegations regarding the individual defendants. Absent good cause, further delay in seeking leave to amend may be prejudicial.

### C
### *Oppenheimer–Palmieri Fund*

Oppenheimer–Palmieri Fund, L.P., a plaintiff to the original complaint, does not join in the EMI/Zinn motion to amend. Moreover, it has agreed to dismiss, with prejudice, its negligence and negligent misrepresentation claim against Peat Marwick pursuant to a stipulation signed by the court on June 10, 1992.

The Fund may pursue remaining claims stated in the original complaint.

### III
### *Negligence and negligent misrepresentation*

Peat Marwick moves for partial summary judgment dismissing the negligence and negligent misrepresentation claim contained in the EMI/Zinn Complaint.

For the purpose of this motion, the parties seemingly agree that Peat Marwick, knowing Crazy Eddie was "in play" as a potential take-over target, negligently issued an audited financial statement for the year ending March 1, 1987 and that plaintiffs justifiably relied on such statement to their detriment. Plaintiffs contend that Peat Marwick knew that the EMI/Zinn plaintiffs, in particular, intended to acquire control of Crazy Eddie. Peat Marwick disputes, and the court ignores, this contention unsupported by the papers.

Plaintiffs argue, in sum, that when an accounting firm negligently audits financial statements of a publicly-traded company, knowing it is "in play," the accounting firm owes a duty of care to investors who, soon

thereafter, attempt or succeed in acquiring sufficient shares of common stock to gain control of the company.

Peat Marwick contends it owes no such duty.

### A

The parties contest, first, whether New York or Texas law should apply to this dispute.

■ Peat Marwick urges the adoption of New York law because much of the allegedly negligent accounting work was performed here and because the Peat Marwick partners assigned to various audits were headquartered here. Plaintiffs concede that under New York law, parties suing accountants for negligent misrepresentation must show privity of contract between the plaintiffs and the accountants, or certain specified conduct which is the effective equivalent. *Ultramares Corp. v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931). Plaintiffs further concede that they were not in privity or its effective equivalent with Peat Marwick, and that if the dispute were governed by New York law, Peat Marwick's motion should be granted.

Plaintiffs urge the adoption of Texas law. They assert, in substance, that both plaintiffs are residents of Texas, that Peat Marwick is a Texas resident since it has partners there, and that all of the negligently performed field work for the 1987 audit was done in New Jersey. They argue that because New York has no compelling interest in enforcing its law, the court should apply Texas law.

Neither party has provided affidavits adequately addressing the material facts needed to decide this choice of law question. The court therefore assumes, for the purpose of this motion, that Texas law may apply.

### B

■ In determining whether Peat Marwick owed a duty of care to plaintiffs under Texas law, this court must follow the law directed by the Texas Supreme Court or, in the absence of such controlling authority, must determine what that court would find were the question presented there. *See Plummer v. Lederle Labs.*, 819 F.2d 349, 355 (2d Cir.), *cert. denied*, 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987).

The scope of an accountant's duty to third parties has not been addressed by the Texas Supreme Court. But in *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991), that court unqualifiedly endorsed the definition of negligent misrepresentation contained in the Restatement (Second) of Torts § 552 (1977). Section 552 provides:

> Information Negligently Supplied for the Guidance of Others
>
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> > (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
> >
> > (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class or persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Plaintiffs contend, first, that they are members of the "limited class" referred to in section 552(2)(a), and, second, that Peat Marwick is under the public duty referred to in section 552(3).

### 1.

The court first addresses their second contention. Plaintiffs' argument is that section 552(3) "seems to be applicable to accountants for a public corporation," and that "[i]t is also quite likely that given the state's broad approach to liability if the circumstances arise, Texas will broadly interpret section 552(3) in the context of auditors of public corporations." They cite no cases providing even remote support for such propositions.

Plaintiffs' argument amounts to little more than earnest yearning, based on a misreading of the language of the Restatement. At most plaintiffs might argue that Crazy Eddie, as a publicly-traded company required to file periodic reports with the SEC, owes a "public duty" and would owe a duty of care to investors for whose benefit that public duty was created. This would make the extraordinary assumption that the drafters of the "Restatement" intended to provide every shareholder a claim, sounding in tort, whenever a company negligently issued a report required under federal or state securities laws.

In any event, Peat Marwick, unlike Crazy Eddie, was never under a statutory obligation to issue financial statements regarding Crazy Eddie. It issued those reports simply because it had been retained to do so. Section 552(3) has no bearing on this dispute.

### 2.

Plaintiffs contend, second, that they are members of the "limited class" referred to in section 552(2)(a), as that class has been expansively defined by Texas courts.

### a.

In support of this position, they point to dicta contained in three Texas intermediate court decisions.

In *Cook v. Larson*, 700 S.W.2d 231 (Tex. Ct.App.1985), the court held that a land surveyor, retained to survey a residential property, had a duty of care to the subsequent purchaser of the property who justifiably relied on the survey. The survey had mistakenly indicated that additions to a house were within the lot. The court stated that it would extend liability to "the person or class of persons whom the maker of the representation intends to benefit or who foreseeably may be expected to rely on the information." *Id.* at 234. But it later noted that a future purchaser of a house, "unlike ... future purchasers of shares of stock attempting to hold an accountant liable," was not a member of an "unlimited class." *Id.* at 236.

In *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408 (Tex.Ct. App.1986), the court held that an accountant could owe a duty of care to his client's trade creditors. There, Peat Marwick had audited a chain of department stores and had provided its client, as requested, seventy copies of the final version of an audit. The chain gave one of these copies to Blue Bell, a clothing manufacturer, which extended substantial credit to the chain. Some seventeen months later, the chain filed for bankruptcy protection.

The court expressly found that Blue Bell was within the "limited class" defined in section 552(2)(a) of the Restatement. *Id.* at 412 & n. 3. It disagreed with the Restatement's requirement that an accounting firm have actual knowledge that a third party would rely on the audited financial statements and held, instead, that a firm would be liable if it knew, or should have known, that a particular third person or class of persons would have relied on the statement. *Id.* The court stressed that Blue Bell was within a knowable "limited class," since it received one of the seventy audited statements prepared by Peat Marwick.

In *Hermann Hosp. v. National Standard Ins.*, 776 S.W.2d 249 (Tex.Ct.App. 1989), the court held that an insurance company could be liable to a hospital for negligently informing the hospital that a patient was insured. The court stated that "[u]nder *Cook* and *Blue Bell*, liability is extended to the persons or class of persons ... who foreseeably may be expected to act in reliance on it." *Id.* at 254. Not only did the court misread *Cook* and *Blue Bell* by seemingly abandoning the "limited class" constraint, it did so in a case in which the

defendant made a negligent misrepresentation directly to the plaintiff. The court was focusing solely, if loosely, on whether plaintiff's injury was foreseeable and therefore proximately caused by the misrepresentation, not on whether defendant owed a duty to a third party.

Contrary to plaintiffs' contention, these cases do not suggest that Texas courts have or would find that accountants owe a duty of care to a "limited class" of future major investors seeking to acquire control, through open-market purchases, of a publicly-traded company. The *Cook* and *Blue Bell* courts both carefully cabined an accountant's duty within a "limited class" of ascertainable third persons. In both cases, the plaintiffs received the very documents prepared by defendants. Only the *Hermann Hospital* court seemingly untied a professional's duty of care from its "limited class" mooring. But that was not a case in which liability to a third party was even raised.

b.

By focusing solely on the reference in section 552(2)(a) to a "limited group," plaintiffs have ignored section 552(2)(b). The Texas Supreme Court is unlikely to do likewise.

Section 552(2)(b) further limits liability to loss suffered "in a transaction that [the professional] intends the information to influence or knows that the recipient so intends or in a substantially similar transaction." The language seemingly limits accountant liability to private transactions, such as when an accountant's audit and opinion are relied upon in a privately-negotiated merger. *See, e.g., H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 461 A.2d 138 (1983).

While courts outside of Texas have disagreed as to whether an accountant must know or must merely foresee that a third party might rely on his or her audits, reports, or appraisals, virtually every court has limited an accountant's duty of care to third persons involved in private transactions. *See, e.g., Sahlen & Assocs., Inc. Sec. Litig.*, 773 F.Supp. 342, 374 (S.D.Fla. 1991); *Dowling v. Narragansett Capital Corp.*, 735 F.Supp. 1105, 1124–25 (D.R.I. 1990); *Touche Ross & Co. v. Commercial Union Ins. Co.*, 514 So.2d 315 (Miss.1987); *Int'l Mortgage Co. v. John P. Butler Accountancy Corp.*, 177 Cal.App.3d 806, 223 Cal.Rptr. 218 (1986). *See also Bethlehem Steel Corp. v. Ernst & Whinney*, 822 S.W.2d 592 (Tenn.1991) (surveying case law); Romualdo P. Eclavea, *Liability of Independent Accountant to Investors or Shareholders*, 35 A.L.R.4th 225.

Only lower courts applying California law have held that accountants have a duty to prospective shareholders when preparing Registration Statements and other documents in connection with a public offering of securities. *See, e.g., Gaillard v. Arthur Young*, No. 85–2373, 1985 WL 5814 (N.D.Cal. July 10, 1985). But these courts have declined to extend that duty when the negligence occurred, as here, in the making of subsequent "after market" disclosures. *See, e.g., Moskowitz v. Vitalink Communications Corp.*, 751 F.Supp. 155, 160 (N.D.Cal.1990). As the *Moskowitz* court noted, "[s]uch expansive liability is unwarranted in light of the broad protections afforded plaintiffs under federal and state securities law." *Id.*

Plaintiffs have not cited, and the court cannot find, a single decision by any court extending an accountant's duty of care to as-yet unidentified future open-market buyers of publicly-traded securities, even when that duty is limited to the rarified class of buyers with sufficient resources to acquire control of entire companies. *Cf. Brug v. The Enstar Group, Inc.*, 755 F.Supp. 1247, 1258 (D.Del.1991) ("If any member of the public who might choose to invest in the [corporations's] common stock were to qualify as part of the protected class, then the 'limited group' requirement would be meaningless").

This court believes that the Texas Supreme Court is unlikely to adopt a rule so universally avoided by sister states.

c.

Moreover, this court finds no analogy in federal securities legislation or case law

that might lead the Texas Supreme Court to impose a duty of care here.

Disclosures, such as the 1987 Crazy Eddie financial statement, are subject to review under section 10(b) of the 1934 Act. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), the Supreme Court held that a private action against accountants would not lie under section 10(b) in the absence of an allegation of "'scienter'—intent to deceive, manipulate, or defraud." *Id.* at 193, 96 S.Ct. at 1381. While most Courts of Appeal have decided that reckless conduct can satisfy the scienter requirement, *see, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 575 (2d Cir.), *cert. denied,* 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982), none has held that negligence satisfies the requirement.

The court concludes that the Texas Supreme Court would not disturb the balance struck by the federal securities regulatory scheme which conforms the level of liability to the degree of culpability.

### 3.

The court holds that the Texas Supreme Court would find that under Texas law Peat Marwick owed no duty of care to major open-market purchasers of Crazy Eddie securities, even though Peat Marwick could foresee that such "players" would rely on its audits and opinions.

Peat Marwick's motion for partial summary judgment on the negligence and negligent misrepresentation claim is granted.

### IV

### *Conclusion*

The court decides the pending motions as follows:

(i) *The EMI/Zinn Complaint.* The EMI/Zinn plaintiffs' motion to amend the complaint is granted. The court strikes the RICO and fraud claims against Sam M. Antar without prejudice. The EMI/Zinn plaintiffs shall have twenty days from the date of this order to apply for leave to amend the RICO, securities fraud, and common law fraud claims against the individual defendants.

(ii) *The Class Complaint.* The motion to amend the Class Complaint to add a RICO claim against Peat Marwick is undecided, pending further briefing by the parties on whether class plaintiffs have standing under section 1964(c).

(iii) *The Negligence Claims.* Peat Marwick's motion for summary judgment with respect to the negligence and negligent misrepresentation claim in the EMI/Zinn Complaint is granted.

So ordered.